HENRY HOLLMAN, JR., EMPLOYEE, v. CITY OF RALEIGH, PUBLIC UTILITIES DEPARTMENT, EMPLOYER, SELF-INSURER, CARRIER.

(Filed 20 March 1968)

1. **Master and Servant § 73—**

   Findings of fact of the Industrial Commission, except for jurisdictional findings, are conclusive on appeal when supported by competent evidence, even though there is evidence that would support a finding to the contrary.

2. **Evidence § 21—**

   Evidential facts which cannot be established by direct evidence may be proved by reasonable and legitimate inferences drawn from the established facts.

**3. Master and Servant § 93—**

The Industrial Commission is vested with full authority to find essential facts, G.S. 97-86, and the Commission is the sole judge of the credibility of the witnesses and the weight to be given their testimony.

**4. Master and Servant § 64; Evidence § 50— Expert testimony held sufficient to show that employee's loss of vision resulted from electric shock.**

The evidence was to the effect that plaintiff, who had never worn glasses nor had trouble with his vision, came into contact with a high voltage wire during the course of his employment and sustained an electric shock. A medical expert in the field of eye diseases testified that his examination disclosed that claimant's vision was 20/200 in each eye and that it was his opinion the impaired vision was caused by the electric shock. On cross-examination the witness repeated his opinion but admitted that he had never known any myopia patients whose impairment was caused by shock nor had he read of such a case in any medical textbook. *Held:* The evidence was sufficient to support a finding by the Industrial Commission that the injury resulted from the accident.

**5. Master and Servant § 67—**

To obtain an award of compensation for an injury under the Workmen's Compensation Act, an employee must establish that his injury caused his disability, unless it is included in the schedule of injuries made compensable by G.S. 97-31 without regard to loss of wage-earning power.

**6. Master and Servant § 71—**

Compensation for partial loss of vision by a claimant should be awarded on the basis of the vision remaining without the use of corrective lenses. G.S. 97-31(19).

**7. Master and Servant § 45—**

The Workmen's Compensation Act should be liberally construed to effectuate its purpose of providing compensation for injured employees or their dependents, and its benefits should not be denied by a technical, narrow or strict construction.

**8. Appeal and Error § 45—**

Assignments of error in appellant's brief for which no reason or argument is stated or authority cited are deemed abandoned.

HUSKINS, J., took no part in the consideration or decision of this case.

APPEAL by defendant from *Copeland, S.J.,* 13 June 1967 Civil Session of WAKE. Docketed and argued as Case No. 532, Fall Term 1967, and docketed as Case No. 528, Spring Term 1968.

This proceeding originated as a compensation claim before the North Carolina Industrial Commission.

This proceeding was originally heard before Honorable J. W. Bean, Chairman of the Industrial Commission, in Raleigh, North Carolina, on January 28 and 29, 1965, both parties being represented by counsel. At the inception of the hearing the following stipulations

were entered into by and between the parties: (1) That the parties are subject to and bound by the provisions of the North Carolina Workmen's Compensation Act; (2) that defendant-employer was a self-insurer at the time of the accidental injury herein involved; (3) that plaintiff was employed by defendant on 21 September 1962 at an average weekly wage of $46.35; (4) that plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant on 21 September 1962, when he came in contact with a high voltage wire and sustained an electric shock; and (5) that defendant-employer accepted liability, and the parties entered into an agreement on I. C. Form No. 21 for the payment of compensation to plaintiff for his temporary total disability, pursuant to which agreement defendant paid plaintiff compensation at the rate of $27.81 per week for a period of six weeks from 24 September 1962 to 4 November 1962.

The plaintiff offered evidence in substance as follows: Prior to 21 September 1962 he was a well, able-bodied man. On 21 September 1962 he was working for the city as its employee on Highway No. 1. He was removing some pipe from a ditch. There were others working with him, and they were taking the pipe out by a crane which was being operated by Mr. Otis Podner. Plaintiff was standing on one side of the ditch and another boy was standing on the other side of the ditch. This boy turned the pipe where plaintiff could take hold of it and told him to catch the pipe and place it in the road so that he could take it loose from the crane. When plaintiff took hold of the pipe, this boy "swung it," and that is all that he remembers. He was taken to the hospital that morning about 9:00 a.m. and stayed there until about 1:30 p.m., at which time he was released and sent home. On the following Monday he went to a doctor on Highway No. 1. He went to see this doctor twice. This doctor recommended that he go to Dr. Davis, which he did. He was treated by Dr. Davis, and Dr. Davis recommended that he see Dr. Leroy Allen, which he did. After that he went to the hospital and then went back home. He was later told to go see Dr. Thornhill for his eyes. He went to the city officials and explained this to them. Later they called and told him to go to Dr. Thornhill's office. Dr. Thornhill treated his eyes. Prior to going to Dr. Thornhill he did not wear glasses and had never had any trouble with his vision before the accident. He got glasses about a week after he saw Dr. Thornhill. Without his glasses he cannot see as well as he could before the accident. He is very near-sighted. He can see right well but when he takes his glasses off he cannot see well enough to identify a person. As a result of the injury by accident, plaintiff's feet and hands were

burned by the electric current, but there were no burns elsewhere on his body.

After the original hearing in Raleigh, Chairman Bean entered an order on 12 April 1965 to this effect: After carefully reviewing all the competent evidence, especially the medical evidence, it is the opinion of the Commission that plaintiff should be further examined to determine his present condition, and particularly as to whether coming in contact with 7200 volts of electric current would in any way affect a person's vision according to medical opinion. Chairman Bean, therefore, ordered that plaintiff be examined by an ophthalmologist at Duke Hospital, and that the Commission withhold any decision in the case until the report of the examination is received.

Defendant appealed from the order of Chairman Bean requiring further medical examination of plaintiff. This appeal came on to be heard before the Full Commission on 14 July 1965. Chairman Bean did not sit as a member of the Full Commission on this appeal. After hearing the appeal, the Full Commission entered an order striking Chairman Bean's order that plaintiff be given an ophthalmological examination at Duke Hospital and directed that the case be remanded to Chairman Bean "for the purpose of arriving at a decision in the matter based on the present record, or in the event Chairman Bean deems additional medical evidence of Raleigh doctors necessary for a proper determination in the case, the Full Commission directs that he reset the case for such additional evidence."

The case was reset for hearing in Raleigh before Chairman Bean on 10 February 1966, but was continued and reset for hearing in Raleigh before Chairman Bean on 31 May 1966. After the rehearing Chairman Bean entered an award in substance as follows: He found as true the facts stipulated by the parties and the following additional facts: (1) Plaintiff's injury by accident on 21 September 1962 was caused by his coming in contact with an electric wire carrying 7200 volts of electricity, burning his hands and feet. (2) As a result of the injury sustained on 21 September 1962 plaintiff was treated by Dr. James Robert Ballew, an admitted medical expert, specializing in ophthalmology, ear, nose, and throat diseases. (3) Dr. Ballew's opinion was that plaintiff was nearsighted, and he prescribed glasses to correct such condition. (4) Dr. Ballew was of the opinion that after he had fitted the claimant with glasses that he had a normal 20/20 vision. (5) Plaintiff was also treated for his eye condition by Dr. George T. Thornhill, an admitted medical expert, specializing in eye, ear, nose, and throat diseases. On 31 October 1962 Dr. Thornhill first saw the plaintiff who had a history of having come in contact with a high voltage wire which knocked him out.

(6) When Dr. Thornhill first saw plaintiff, his vision was 20/200 in each eye, without correction. He fitted plaintiff with glasses which brought his vision back to 20/20 in each eye which is considered normal vision. Dr. Thornhill saw plaintiff at subsequent times, to wit, 6 December 1962 and 12 December 1962, at which times his vision without glasses was 20/200 and with glasses, 20/20. (7) Dr. Thornhill was of the opinion that astigmatism or nearsightedness was caused by the electric shock that plaintiff received on 21 September 1962. (8) Plaintiff has a vision of 20/200 in each eye without glasses which is an 80% loss of vision. His vision is brought back to normal with the use of glasses.

Based upon his findings of fact, Chairman Bean made the following conclusions of law: Plaintiff sustained an injury by accident arising out of and in the course of his employment, and the defendant accepted liability and paid plaintiff for the time he was disabled. The determinative question is whether or not plaintiff sustained any permanent disability to his eyes as a result of the injury. To determine this question, the Commission has to rely upon expert medical testimony. The greater weight of the expert medical testimony is that plaintiff sustained an 80% permanent partial disability to both eyes, as per the Snellen Chart, as a result of his injury. The Commission concludes as a matter of law that plaintiff has 80% permanent partial disability to his eyes and is entitled to compensation "under the provisions of G.S. 97-31(16), *Schrum v. Catawba Upholstering Co.*, 214 N.C. 353, and *Watts v. Brewer*, 243 N.C. 422, for a period of 192 weeks at $27.80 per week."

Based upon his findings of fact and conclusions of law, the Commission made the following award: (1) Defendant shall pay plaintiff compensation at the rate of $27.80 per week for a period of 192 weeks for 80% permanent partial disability to his eyes. So much of said compensation as may have accrued shall be paid in a lump sum. (2) Defendant shall pay all medical, hospital, and other treatment bills after the same have been submitted to and approved by the North Carolina Industrial Commission. (3) Defendant shall pay the costs of the hearing, including an expert witness fee in the amount of $20 each for Dr. Ballew and Dr. Thornhill. (4) An attorney fee in the amount of $500 is approved for the plaintiff's attorneys, said amount to be deducted from the compensation due plaintiff and paid direct to said attorneys.

From said ruling defendant appealed. On review, the Full Commission adopted the findings of fact and conclusions of law of Chairman Bean and approved the award. Defendant appealed to the Superior Court. On appeal, Judge Copeland overruled all defendant's

assignments of error and affirmed the award. Defendant appealed to the Supreme Court.

*Paul F. Smith and Donald L. Smith for defendant appellant.*

*F. J. Carnage and George E. Brown by F. J. Carnage for plaintiff appellee.*

PARKER, C.J.   Defendant assigns as error the Commissioner's finding of fact, which was affirmed by the Full Commission as well as the lower court judge, "that Dr. Thornhill was of the opinion that astigmatism or nearsightedness was caused by the electric shock that the plaintiff received on September 21, 1962." This assignment of error presents this question for decision: Were the stipulations and the evidence, viewed in the light most favorable to plaintiff, sufficient to support the challenged finding of fact? If so, this Court is bound by them, for it has long been settled that in a Workmen's Compensation case the findings of fact by the Industrial Commission, which are nonjurisdictional, are conclusive on appeal when supported by competent evidence, even though there is evidence that would have supported findings to the contrary. *Maurer v. Salem Co.,* 266 N.C. 381, 146 S.E. 2d 432; *Askew v. Tire Co.,* 264 N.C. 168, 141 S.E. 2d 280; *Huffman v. Aircraft Co.,* 260 N.C. 308, 132 S.E. 2d 614, cert. den. 379 U.S. 850, 13 L. Ed. 2d 53, reh. den. 379 U.S. 925, 13 L. Ed. 2d 338; *Tucker v. Lowdermilk,* 233 N.C. 185, 63 S.E. 2d 109.

At the beginning of the trial the parties stipulated as follows: "That the plaintiff sustained an injury by accident arising out of and in the course of his employment with the defendant, employer, on September 21, 1962, when he came in contact with a high voltage wire and sustained electric shock."

At the first hearing before Chairman Bean, there were three witnesses for claimant: Claimant himself, Roland Boyd, and Dr. James Robert Ballew. At the second hearing before Chairman Bean, Dr. George T. Thornhill, an admitted medical expert "specializing in eye, ear, nose and throat diseases," testified in substance, except when quoted, on direct examination as follows: He first saw claimant on 31 October 1962, and claimant told him that he had been in an accident in which he was struck by a high voltage wire and knocked out. He examined him with reference to his eyes, and his examination disclosed that his vision was 20/200 in each eye without correction; *i.e.,* without glasses. The examination was performed with a minus 275, which is a correction for nearsightedness, and this brought his vision to 20/20 for both eyes. This is considered average or normal vision. A further examination revealed that the

back of his iris, his retina, was normal. A slit lamp examination, which involves the shining of a light through the lens of the eye, revealed no signs of cataracts. Claimant was given a prescription and told to return in one month for another check. On 6 December 1962 claimant was given a prescription for glasses. Dr. Thornhill examined him again on 12 December 1962, and at that time his vision with glasses was 20/20. In his opinion, claimant will have to continue to wear glasses in order to have a vision of 20/20. Dr. Thornhill testified: "My opinion is that his condition was due to the shock or accident that he had. I have two reasons for believing this. I think that electric shock can alter the lens in the eye to cause some swelling which will cause nearsightedness. The other reason I think is from looking back, that a man with 20/200 vision would have sought help before this. I don't think he could have gotten around too well. In other words, if he had gone to a movie, I don't think he could have seen too much and had he gone to see sports, he couldn't have seen it, and to my understanding, he had not."

Dr. Thornhill's testimony on direct examination is set forth in one page of the record. His cross-examination by defendant is set forth in nine pages of the record, and the relevant part of it is in substance as follows, except when quoted: His reports of his examination refer to claimant's condition as being myopia in every instance; *i.e.*, nearsighted. After he was given a prescription for glasses on 6 December 1962, there were further examinations on 12 December 1962, 14 January 1963, 4 March 1963, 17 June 1963, 19 December 1963, 27 March 1964, and 9 February 1966. The purpose of the 9 February 1966 visit was to have his eyes rechecked. He found his condition the same as it had been on all previous occasions, still nearsighted. There are many causes of myopia. It can be due to heredity, which is the big cause. It can be caused by anything that would cause the swelling of the lens. Hardening of the lens can also cause it. Trauma can cause myopia if it will cause swelling of the lens. In this particular case, he used electric shock as trauma. Anything that will disturb the continuity of the lens or the metabolism of the lens in his opinion can cause nearsightedness. He testified: "I have seen many myopia patients but I have never in my experience seen any myopia patients whose myopia came as a result of electric shock. . . . There are a number of standard textbooks on ophthalmology, Duckelder is the Bible you might say. I have never examined Duckelder's text to see whether or not he had reported any cases of myopia as a result of electric shock." He was further asked: "So the only question is have you ever had personal experience or do you know of any textbooks which might have recorded any ex-

perience of electric shock producing myopia?" He replied: "I have not researched a book to find that." He testified further on cross-examination: "This man has stated that his vision was normal before the accident and, in my opinion, a high voltage current going through his body could cause swelling of the lens, resulting in myopia. The swelling of the lens would not be visible on examination. That is the reason I say in my opinion it could cause it. I did tell you over the telephone when I talked to you sometime ago that I gave this as my opinion because I couldn't exclude this as a possibility. I said in my opinion it could. This was based on a medical judgment, my opinion. It was my opinion that the condition might have been caused by this (electric shock). I will tell you why. When a lens is becoming cataractous, it will develop myopia first or nearsightedness and in my opinion, this could have been a possibility. The shock was not great enough to cause cataracts. It could have caused some swelling of the lens. This is my opinion. I couldn't verify that one way or another. I tell you that here as I told you on the telephone. I can't say whether this is a likelihood or not. This is a rare instance. In my opinion, I wouldn't say it would be a likelihood. I think it would have to be researched and tested on animals in some way before you could say. This is the first case of this kind that I have ever seen that didn't go on to cataracts. . . . In all these cases there was myopia before the cataracts. The time for a cataract to form will vary. It can take years to form. . . . This is the reason we prefer to wait to see if the cataracts would form. Notice I said return in one month. That was the very first visit. That has been three years ago. I expected the cataracts to form in that period of time. I have found no indication of a cataract now. I did examine him as late as January or February of 1966 and this accident occurred in 1962. In my opinion, I don't think he is going to develop cataracts. There again is an opinion. I base this opinion on the fact that the condition has remained stationary for this amount of time. . . ." Later on in the cross-examination Dr. Thornhill was asked this question: "Doctor, I will not ask you any more questions. I will summarize what I think your testimony has been and have you verify, if you will, please, sir — I understand that you are testifying that Henry's eye, myopic condition, could have been caused by the electric shock." He answered: "It was my opinion, yes sir." He was then asked: "And that is an expression of a reasonable medical opinion?" He replied: "Yes sir." He is basing his opinion on what claimant told him and on his own reasonability from what he found. He was of the opinion that he would have sought help before if he had had

myopia. He said in his reasoning that the electric shock could have caused some change in the lens. He testified: "There have been no opacities of the lens. Inflammation is due to traumatic shock or something that would cause a change in the metabolism of the lens, which is the way the lens lives, and that would cause a cataract or opacities. The terms that I used were high voltage current going through his body could cause swelling of the lens and eye, resulting in myopia. And the swelling of the lens in the eye is not a discernible thing that you could observe by examination. . . . Henry said he could see clearly before." They have not had another case that he knows of. He thinks after he talked to the person who was cross-examining him that he did look through Duckelder and did not see a similar case. Unfortunately, he cannot take another case and do the same thing and say this is absolutely identical. If he could try that, he could prove it maybe. He knows that electric shock can cause damage to the lens. There has not been enough work done on the subject to know that it would necessarily cause cataracts.

These facts are undisputed according to the evidence: Prior to 21 September 1962, and on that date, plaintiff was a well, able-bodied man, who had never worn glasses and had had no trouble with his vision. At the hearing before the Hearing Commissioner, the parties stipulated that claimant sustained an injury by accident arising out of and in the course of his employment with defendant on 21 September 1962 when he came in contact with a high voltage wire and sustained an electric shock. As a result of claimant's injury by accident, his hands and feet were burned by the electric shock, but there were no burns elsewhere on his body. On 31 October 1962 plaintiff was examined by Dr. George T. Thornhill, an admitted medical expert, "specializing in eye, ear, nose, and throat diseases," and his examination disclosed that claimant's vision was 20/200 in each eye. To establish a causal connection between the electric shock and the injuries to plaintiff's eyes, claimant offered the testimony of Dr. Thornhill, who testified that in his opinion the cause of plaintiff's impaired vision "was due to the shock or accident that he had." He further testified: "I have two reasons for believing this. I think that electric shock can alter the lens in the eye to cause some swelling which will cause nearsightedness. The other reason I think is from looking back, that a man with 20/200 vision would have sought help before this. I don't think he could have gotten around too well." During a lengthy grueling cross-examination Dr. Thornhill repeated his opinion that claimant's myopia was caused by the electric shock. It is true that Dr. Thornhill testified on cross-examination that he

had never in his experience seen any myopia patients whose myopia came as the result of electric shock and that he had never read in any standard textbook that myopia was caused by an electric shock. It is also true that Dr. Thornhill said he could not verify his opinion and to do so he thinks it would have to be researched and tested on animals in some way. "While 'possibility' is not enough to prove a claim, absolute certainty is not generally required. Reasonable certainty is sufficient." 12 Schneider, Workmen's Compensation § 2530(e) (3rd or perm. ed. 1959) [hereinafter cited as Schneider]. The Hearing Commissioner found as a fact, which was approved by the Full Commission and the judge, that plaintiff's injury by accident on 21 September 1962 was caused by his coming in contact with an electric wire carrying 7200 volts of electricity. The basis of this finding of fact lies most appropriately in the field of technical knowledge. Evidential facts which cannot be established by direct evidence may be proved by reasonable and legitimate inferences drawn from the established facts. *McGill v. Lumberton,* 215 N.C. 752, 3 S.E. 2d 324; 12 Schneider § 2531. The fact that Dr. Thornhill had never seen a case of myopia caused by an electric shock and any slight inconsistencies in his testimony were matters for the hearing tribunal to consider in passing upon the credibility and the weight of Dr. Thornhill's evidence in finding the facts. The parties admitted that Dr. George T. Thornhill was a medical expert specializing in eye, ear, nose, and throat diseases. Such an admission necessarily is to the effect that Dr. Thornhill must have acquired such special knowledge of the subject matter about which he testified as to give Chairman Bean and the Full Commission assistance and guidance in solving a problem to which the layman's equipment of good judgment and average knowledge is inadequate.

This is said in *Anderson v. Construction Co.,* 265 N.C. 431, 144 S.E. 2d 272: "The Workmen's Compensation Act, G.S. 97-86, vests the Industrial Commission with full authority to find essential facts. The Commission is the sole judge of the credibility of the witnesses *and the weight to be given their testimony.* . . . The court does not have the right to weigh the evidence and decide the issue on the basis of its weight. The court's duty goes no further than to determine whether the record contains any evidence tending to support the finding." (Emphasis ours.)

It is our opinion and we so hold that Dr. Thornhill's testimony, viewed *in toto,* was sufficient to establish a causal relationship between the accident and the injury. Such testimony did not constitute pure speculation on Dr. Thornhill's part, and it amply supports

Chairman Bean's finding of fact, which was approved by the Full Commission and the judge, that Dr. Thornhill was of the opinion that plaintiff's astigmatism or nearsightedness was caused by the electric shock that he received on 21 September 1962. The assignment of error to this finding of fact is overruled.

Defendant assigns as error the awarding of any compensation in the present instance to claimant. Its contention is this: "The Industrial Commission follows the Snellen Chart in determining the compensation to be paid the plaintiff for his total *(sic)* partial disability. The Snellen Chart appears at Page 226 of the Rules and Regulations adopted by the Industrial Commission. At the bottom of the Chart, it is said that it should be applied without respect to the effect of corrective lenses." Defendant's argument in essence is this: "The plaintiff in this case has corrected vision, with glasses, which returns his eyes to normal which is far better vision than most people enjoy. He has returned to work at no loss of wages and will, according to Dr. Thornhill maintain his vision at 20/20 with the use of corrective glasses. There is no disability as defined by Statute." This assignment of error is overruled.

G.S. 97-2 (9) reads: "The term 'disability' means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." To obtain an award of compensation for an injury under the Workmen's Compensation Act, an employee must establish that his injury caused his disability, "unless it is included in the schedule of injuries made compensable by G.S. 97-31 without regard to loss of wage-earning power." *Anderson v. Motor Co.*, 233 N.C. 372, 64 S.E. 2d 265.

G.S. 97-31 reads:

> "In cases included by the following schedule the compensation in each case shall be paid for disability during the healing period and in addition the disability shall be deemed to continue for the periods specified, and shall be in lieu of all other compensation, including disfigurement, to wit:
>
> \*　　　\*　　　\*
>
> "(16)　For the loss of an eye, sixty per centum of the average weekly wages during one hundred and twenty weeks.
>
> \*　　　\*　　　\*
>
> "(19)　Total loss of use of a member or loss of vision of an eye shall be considered as equivalent to the loss of such member or eye. The compensation for partial loss of or for partial loss

of use of a member or for partial loss of vision of an eye . . . shall be such proportion of the periods of payment above provided for total loss as such partial loss bears to total loss, except that in cases where there is eighty-five per centum, or more, loss of vision in any eye, this shall be deemed 'industrial blindness' and compensated as for total loss of vision of such eye."

Courts are in sharp conflict as to whether the correction of vision by lenses is a factor to be considered in determining compensation for eye injuries. 99 C.J.S. Workmen's Compensation § 316(b); 8 A.L.R. 1330; 24 A.L.R. 1469; 73 A.L.R. 716; 99 A.L.R. 1507; 142 A.L.R. 832; 11 Schneider § 2346(e). An examination of many of these conflicting cases shows that many are founded upon statutes based upon the theory that compensation was payable only when the accident led to loss of earning power. The North Carolina statute specifically provides for compensation for the loss of an eye or vision, total or partial, attributable to permanent injury arising out of and in the course of an employee's employment. Nothing in the North Carolina statute indicates an intention on the part of the General Assembly that glasses or corrective lenses should be considered in determining the loss of the whole or a fractional part of the vision of an eye. If the purpose of the statute is to compensate for a specific loss of partial vision, as is the case with our statute, naked vision, alone, should be considered, but if the purpose of the statute is to compensate only for loss of earning power, which is not the case with us, the corrected vision should be a factor. The conflict in the states' decisions is more apparent than real being due in many instances to differences in the controlling statutes.

This is said in *Schrum v. Upholstering Co.*, 214 N.C. 353, 199 S.E. 385:

"The compensation provided is for the 'loss of vision of an eye.' The sense of sight is just as precious to the person who is suffering from a defective vision due to astigmatism which may be, and is, corrected by the use of glasses, as it is to one whose sight is unimpaired. It is for this loss of vision the statute seeks to compensate.

"This employee, by the use of glasses, possessed vision which is considered normal or perfect, and there is nothing in this record which indicates that the accident would not have resulted in the destruction of his vision had the former condition not existed. This 'source and substance of vision' has been destroyed

by the injury he sustained. For this loss he is entitled to the full compensation provided by statute."

This is said in 11 Schneider § 2346(e):

"Should an injured eye or eyes be compensated on the basis of vision with or without corrective lenses? While there is a substantial conflict in the authorities on this question, as will be noted more fully later herein, the majority view is succinctly stated by the Florida Supreme Court [*Burdine's v. Green*, 150 Fla. 361, 7 So. 2d 460] as follows: 'The criterion for arriving at proper awards where there is injury to an eye is the percentage of that injury regardless of the use of artificial lenses.' The reason frequently given for following this view is the statute makes no reference to the effect of corrective devices. The courts that follow the opposite view hold that vision with corrective device is still vision and useful as such, though accomplished by artificial means."

The cases supporting the text are cited therein.

We are impressed with the language of the Court of Errors and Appeals of New Jersey in *Johannsen v. Union Iron Works*, 97 N.J.L. 569, 117 A. 639, which quotes with approval the language of the Supreme Court of that State, in the case they were dealing with on appeal as follows:

"It seems to us, that, where one must depend upon some mechanism, braces or glasses, to enable a member of the body to function properly, and such necessity is the result of accident, that such member is permanently impaired. An eye dependent upon glasses for normal vision is not as good as an eye which requires no such aid for its vision."

For a comprehensive review of the authorities and their conflicts see *Lambert v. Indus. Com.*, 411 Ill. 593, 104 N.E. 2d 783 (1952). In the *Lambert* case the Supreme Court if Illinois held that an injury to an eye which was industrially blind without correction but normal with correction was compensable.

We have held in decision after decision that our Workmen's Compensation Act should be liberally construed to effectuate its purpose to provide compensation for injured employees or their dependants, and its benefits should not be denied by a technical, narrow, and strict construction. 3 Strong, N. C. Index, Master and Servant, § 45.

Construing our statute as above stated, it is our opinion, and we so hold, that under the facts of this case and the stipulations it is

HENDERSON *v.* FINANCE CO.

the clear intent, purpose, meaning, and language of our compensation statute that claimant should be compensated for the injuries to his eyes on the basis of vision remaining without corrective lenses.

Defendant has other assignments of error for which no reason or argument is stated or authority cited, and consequently they are deemed to be abandoned. 1 Strong, N. C. Index 2d, Appeal and Error, § 45. Defendant has no argument or citation of authority to suggest that the amount of compensation to be paid to claimant or the length of time it is to be paid, by order of the court, is error. Defendant in his brief states two questions are involved, which are as follows: "I. Is there evidence to support the Commission's and the Court's finding that there is a causal relation between the plaintiff's injury by electric shock and his myopic condition which has impaired his vision? II. Should plaintiff's loss of vision be measured with or without the use of corrective lenses?"

The judgment of the court below is
Affirmed.

HUSKINS, J., took no part in the consideration or decision of this case.