ERNEST PAUL PRIDDY v. BLUE BIRD CAB COMPANY, INC., AND
AETNA CASUALTY AND SURETY COMPANY

No. 7021IC366

(Filed 26 August 1970)

1. Master and Servant § 66— workmen's compensation — total disability — loss of mental capacity from brain injury — mental capacity defined

    As used in the statutes relating to compensation for total disability from loss of mental capacity resulting from injury to the brain, G.S. 97-29 and G.S. 97-41, the words "mental capacity" mean that quality of mind which enables a person to act with reasonable discretion in the ordinary affairs of life and to comprehend in a reasonable manner the nature, scope and effect of his acts and conduct.

2. Master and Servant § 66— workmen's compensation — total disability — award for life — loss of mental capacity from brain injury

    In order to sustain an award for life for total disability from loss of mental capacity resulting from injury to the brain, it is not required that there be a total loss of mental capacity, but only that there be a total and permanent disability resulting from a loss of mental capacity by an injury to the brain.

3. Master and Servant § 69— workmen's compensation — disability defined

    As used in the Workmen's Compensation Act, "disability" means impairment of wage earning capacity rather than physical impairment.

4. Master and Servant § 66— workmen's compensation — determination of total and permanent disability from brain injury

    The question of whether there has been a total and permanent disability resulting from a loss of mental capacity caused by or resulting from an injury to the brain is one of fact.

5. Master and Servant § 66— workmen's compensation — mental incapacity from brain injury — control of temper

    The control of one's temper is a mental function within the meaning of the statutes relating to lifetime compensation for total dis-

ability from loss of mental capacity resulting from injury to the brain. G.S. 97-29, G.S. 97-41.

6. **Master and Servant § 94— workmen's compensation — duty of Commission to find facts**

The Industrial Commission is the judge of the credibility of the evidence and is the fact finding body in a workmen's compensation proceeding. G.S. 97-84.

7. **Master and Servant § 96— workmen's compensation — appellate review of findings of fact**

Where the evidence before the Industrial Commission is contradictory, the nonjurisdictional findings of fact by the Commission are conclusive on appeal to the Court of Appeals.

8. **Master and Servant §§ 66, 69— workmen's compensation — total disability — mental incapacity from brain injury — inability to control temper — award for lifetime of claimant**

In this proceeding for workmen's compensation instituted by a former cab driver who suffered a brain injury when a passenger struck him on the back of the head with a pipe, claimant's evidence, including medical testimony that claimant is totally and permanently disabled because of his inability to control his temper since his brain injury, *held* sufficient to support findings by the Commission that claimant is now totally and permanently disabled from loss of mental capacity resulting from injury to the brain and the award of compensation for the lifetime of claimant pursuant to G.S. 97-29 and G.S. 97-41.

APPEAL by defendant Blue Bird Cab Company, Inc., from opinion and award of the North Carolina Industrial Commission (Commission) of 19 February 1970.

It was stipulated that Ernest Paul Priddy (plaintiff) was an employee of the Blue Bird Cab Company, Inc. (defendant); that the parties were subject to the North Carolina Workmen's Compensation Act (Act); that the Aetna Casualty and Surety Company (Aetna) was the "carrier on the risk"; that the plaintiff sustained an injury by accident arising out of and in the course of his employment on 2 February 1963; and the amount of the weekly payments received by plaintiff from defendant was also stipulated.

Plaintiff's evidence tended to show that on 2 February 1963 he was working for the defendant as a cab driver. On that date around 2:00 a.m., he had a passenger in the back seat of the cab he was operating. The passenger pointed to a house and plaintiff looked in that direction. At that time plaintiff was struck on the back of the head with a pipe with such force that his brain

was injured and a portion thereof had to be removed. He was unconscious for several days. He remained in the hospital for twenty days at that time before he was discharged. Plaintiff testified that prior to this occasion he had a "normal temper" but that "since then there has been a change." He sustained other severe injuries, including a partial loss of vision. During the time he was in the hospital, he was first seen by Dr. Ernesto de la Torre in the emergency room on 2 February 1963. Dr. de la Torre, a medical expert specializing in the field of neurosurgery, testified with respect to plaintiff's injuries that:

"He was brought to the emergency room with no blood pressure that could be taken. He had bleeding through his jaw, through the back of his head, cuts in the back of his head, and X-rays showed that he had multiple fractures, also pieces of bone pushing into his brain on the back side, broken jaw, completely unconscious. After that we did a tracheotomy, put a tube down his windpipe so he could breathe and not choke and operated on his head, closed all the lacerations, took all the pieces of bone from within his brain. A lot of his brain was bruised, cut and necrotic—bad brain tissue—and that was removed. That was the first time that I saw him. He healed from all these and he was discharged on the 22nd, 20 days later. By that time, Dr. Alsup and Dr. Weiss had operated on his jaw. He kept on improving so he was discharged. Later we admitted him again and did a craneoplasty in which we put a plastic material to cover up the hole that was there from the previous surgery. No part or portion of the brain was removed during the second operation. At the time of the first surgery, we took a part of the occipital of the brain, which is the back portion of the brain on the right side which has to do with vision, and I would say we took 30 grams. I have seen this patient many, many times.

\*    \*    \*

As for Mr. Priddy's prognosis, I think Mr. Priddy has done an amazing recovery in many respects, but I think Mr. Priddy has had severe and permanent damage to his brain. There are three explicit indicating factors on him. For one thing, he cannot see to the left and down. With that so, I wouldn't trust him driving because he can't see to the left well. Because of his severe brain injury, he is also susceptible in the future to have convulsions and seizures.

I have heard that he has had some small seizures, but I

have never seen any one of them, so I can't testify that they ever existed.

The third other possible conflicting thing, he has very little control of his temper. Whenever he is denied something or arguing something, he cannot hold his temper. He has no control.

'Q.   And do you have an opinion satisfactory to yourself, doctor, that there has been mental changes in Mr. Priddy?

\*          \*          \*

A.   I think Mr. Priddy, since I have known him, he has been very easy to lose control of his temper and that is what I call mental changes.'

When I first examined and performed surgery on Mr. Priddy, I found foreign substances in his brain. I found hair, little pieces of bone, dirt. I was able to completely remove these foreign substances as far as I could see them.

I don't remember how many factures of the skull I found there at that time. There were many lines of fracture, many little fragments of bone pushed in so I couldn't tell. I didn't count them.

The skull of a human being is in more than one piece.

I did not find any dislocation of the cranium.

'Q.   Now, doctor, do you have an opinion satisfactory to yourself as to whether Ernest Paul Priddy is permanently and totally disabled due to the injury to the brain which has resulted in mental incapacity?

\*          \*          \*

A.   I do have an opinion.

Q.   And what is that opinion, doctor?

A.   I think he is permanently disabled.

Q.   Because of the brain damage?

A.   That's right.

Q.   And do you have an opinion satisfactory to yourself that there has been a mental loss of incapacity *(sic)* because of the brain damage?

A.   I think they can be due to brain damage, his mental changes.' "

On cross-examination Dr. de la Torre testified:

"As to whether my testimony is that he is permanently and totally disabled to perform any gainful employment or just the job he was performing at the time he was injured, my impression has been that Mr. Priddy could do some activity of some kind. My only reserve or reservation about this thing and that is who's he going to work for because if I were going to be personnel manager it would be very difficult to hire him because of his ill temper and getting mad very easily. He gets mad with his wife and even myself and friends and people who have been good to him and that is disabling and his visual difficulties disable him from driving. I was trying to get all the things together. In any point of view, I can't testify to his mental status because I'm not a psychiatrist. However, I do have an opinion with all things put together and that's my consideration making him totally disabled, putting all these things together.

I don't know whether his temper pre-existed the accident.

As for whether he has diminished capacity to read, write and think, and ability to analyze his problems, I haven't done psychological testing on him. I think whoever has and measured his eyesight should be able to do that.

Just completely disregarding his temper, the flaring up of it, he would not be permanently disabled because of his other injuries to gain employment. I'd say he would be employable in the sense there are some jobs that can be done. In other words, the distinguishing factor is the personality and temper opposed to any loss of ability or loss of ability to reason and that kind of thing. As I have said before, except for his temper or personality problem, he would not be totally and permanently disabled, but I would like a psychiatrist or psychologist with psychological testing, rather than me, to say. To me his main problem is temper.

Anyone who suffers a major blow to his head such as Priddy suffered is subject to seizure and possible epilepsy."

On redirect examination Dr. de la Torre testified that "(t)hroughout my reports I have stated that in my opinion he was unable to work."

Dr. de la Torre was asked the following question by the hearing commissioner:

"Based on the history that you obtained and your personal knowledge as a result of this injury Mr. Priddy received on February 2, 1963, and your long course of treatment and the operation that you performed on his brain, do you have an opinion satisfactory to yourself from a medical standpoint whether or not Mr. Priddy is permanently and totally disabled due to an injury to the brain and that as a result of said injury he has loss of mental capacity, do you have?"

Dr. de la Torre replied that he did have such opinion and stated, "I think he is permanently and totally disabled from employment."

The evidence of Dr. Courtland H. Davis, Jr., who examined the plaintiff upon order of Deputy Commissioner W. C. Delbridge, tended to show that plaintiff has some partial permanent disability but that in his opinion the plaintiff "is not totally and permanently disabled from loss of mental capacity resulting from an injury to the brain."

The Commission found and concluded that by reason of the plaintiff's injury by accident arising out of and in the course of his employment on 2 February 1963, he is now totally and permanently disabled resulting from loss of mental capacity resulting from the injury to his brain. From an award by the Commission "continuing for the lifetime of the plaintiff" pursuant to the provisions of G.S. 97-29 and G.S. 97-41, the defendant appealed to the Court of Appeals.

*Robert M. Bryant for plaintiff appellee.*

*Allan R. Gitter and Jimmy H. Barnhill for defendant appellant.*

MALLARD, C.J.

The main question for decision in this case is whether there was sufficient competent evidence to support the finding of the Commission that the plaintiff was entitled to an award for life under the provisions of G.S. 97-29 and G.S. 97-41 because of total and permanent disability resulting from loss of mental capacity resulting from an injury to the brain.

The pertinent part of G.S. 97-29 reads:

"In cases in which total and permanent disability results from * * * loss of mental capacity resulting from an injury

to the brain, compensation * * * shall be paid during the life of the injured employee * * *."

The pertinent part of G.S. 97-41 reads:

"In cases where permanent total disability results from * * * loss of mental capacity caused by an injury to the brain * * * compensation shall be payable for the life of the injured employee as provided by G.S. 97-29."

[1] In their briefs and upon the oral argument in this court, the parties agree that the words "mental capacity" as used in these statutes have not been defined in the statutes or in the cases handed down by the appellate courts of this State, and our research has found none. We are of the opinion that the words "mental capacity" as used in the two statutes under consideration are properly defined as that quality of mind which enables a person to act with reasonable discretion in the ordinary affairs of life and to comprehend in a reasonable manner the nature, scope and effect of his acts and conduct. Black's Law Dictionary, 4th Ed.; *Gillikin v. Norcom,* 197 N.C. 8, 147 S.E. 433 (1929); 26 C.J.S., Deeds, § 54(b), p. 720; 44 C.J.S., Insane Persons, § 2, p. 39.

[2-4] The statutes do not require that there be a total loss of mental capacity. What the statutes do require in order to sustain an award for life thereunder, is that there be a total and permanent disability resulting from a loss of mental capacity caused by an injury to the brain. " 'Disability' as used in the Workmen's Compensation Act means impairment of wage earning capacity rather than physical impairment." *Morgan v. Furniture Industries, Inc.,* 2 N.C. App. 126, 162 S.E. 2d 619 (1968). The question of whether there has been a total and permanent disability resulting from a loss of mental capacity caused by or resulting from an injury to the brain is one of fact.

[5, 8] The evidence in this case is contradictory. Dr. Davis' reports tended to show that the plaintiff was only partially permanently disabled and that in his opinion the plaintiff was not totally and permanently disabled from loss of mental capacity resulting from an injury to the brain. The testimony of Dr. de la Torre tended to show that the plaintiff is totally and permanently disabled and revealed that the reason the plaintiff is totally and permanently disabled is because of his inability or capacity to control his temper since his brain injury. The evidence tended to show that prior to his brain injury, plaintiff was able to work

and after the brain injury was not able to work because of his inability to control his temper. When considered in the light of the above definition of "mental capacity," the control of one's temper is a mental function.

[6, 7] The Commission is the judge of the credibility of the evidence and is the fact finding body under the Act. G.S. 97-84. *Brice v. Salvage Co.,* 249 N.C. 74, 105 S.E. 2d 439 (1958). Where the evidence before the Commission is contradictory, the findings of fact by the Commission, which are nonjurisdictional, are conclusive on appeal to the Court of Appeals. *Hollman v. City of Raleigh,* 273 N.C. 240, 159 S.E. 2d 874 (1968) ; *Evans v. Topstyle, Inc.,* 270 N.C. 134, 153 S.E. 2d 851 (1967) ; *Taylor v. Twin City Club,* 260 N.C. 435, 132 S.E. 2d 865 (1963).

[8] We hold that there was sufficient competent evidence before the Commission to support its findings, that by reason of the plaintiff's injury by accident arising out of and in the course of his employment on 2 February 1963, he is now totally and permanently disabled resulting from loss of mental capacity resulting from an injury to the brain, and the award of compensation "continuing for the lifetime of the plaintiff" pursuant to G.S. 97-29 and G.S. 97-41.

No prejudicial error is made to appear in appellant's other assignments of error.

The award of compensation herein is affirmed.

Affirmed.

PARKER and HEDRICK, JJ., concur.