LARRY E. TURNER, Employee, Plaintiff,
v.
CUSTOM RETAIL SERVICES, INC. Employer,
EMPLOYER'S INSURANCE COMPANY OF WAUSAU, Carrier, Defendants.
No. COA08-300
Court of Appeals of North Carolina.
Filed December 2, 2008
This case not for publication
Lyndon R. Helton, PLLC, by Lyndon R. Helton, for plaintiff-appellee.
Hedrick, Gardner, Kincheloe & Garofalo, L.L.P., by Taurus E. Becton, for defendants-appellants.
MARTIN, Chief Judge.
Custom Retail Services[1] ("defendant-employer") and Employer's Insurance Company of Wausau (collectively "defendants") appeal from an Opinion and Award by the North Carolina Industrial Commission("Commission") awarding benefits to employee Larry E. Turner ("plaintiff"). We affirm.
The parties stipulated in a Pre-Trial Agreement that an employment relationship existed between plaintiff and defendant-employer at the time of the 27 January 2005 accident and that plaintiff sustained a compensable injury as a result of the accident. The Commission's unchallenged findings of fact are as follows:
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 40 years old and had graduated from high school. Plaintiff's relevant work history consists of retail work in the grocery industry.
2. Plaintiff worked for defendant-employer [as a custom retail product manager] from May 10, 2004 through June 3, 2005. Defendant-employer is a vending service company that services Lowe's Home Improvements Stores. Plaintiff's duties primarily consisted of setting up displays in Lowe's outlets.
3. On January 27, 2005, while in the course and scope of his employment, plaintiff was injured when he experienced a sudden onset of back pain [which extended down into his buttock and also down into the posterior and medial thigh] while moving a rack of wallpaper[, which was approximately seven feet tall and four feet wide]. Plaintiff notified Human Resources of his injury and was instructed to present to North Cross Urgent Care where he was diagnosed with sciatica.
4. On February 2, 2005, plaintiff presented to Dr. Edwards with complaints of right lumbosacral pain and some right thigh pain and was given light duty work restrictions [limiting his movement to "minimal" bending, twisting, walking, standing, and climbing, and setting his lifting limit at 5 lbs]. Plaintiff was also referred to physical therapy at that time. On a follow-up visit on February 9, 2005, plaintiff reported having increased pain as well as some numbness in his right foot. He was eventually referred for an orthopedic evaluation and a lumbar MRI scan.
5. On March 1, 2005, plaintiff presented to Dr. Knapp for the orthopedic evaluation and reported complaints of back and bilateral leg pain. On that date, it was recommended that he undergo epidural injections and physical therapy. It was again recommended that he continue on light duty work. Plaintiff underwent epidural injections that were performed by Dr. Christopher Hunt. On April 6, 2005, plaintiff followed-up with Dr. Knapp complaining of low back pain as well as some neck pain. On that date, Dr. Knapp opined that plaintiff had lumbar disc disease as well as a cervical strain. It was again recommended that plaintiff undergo physical therapy. Dr. Knapp recommended a lumbar myelogram and post myelogram CT be completed, which were found to be normal with the exception of some mild bulging on the lateral myelogram at L4-5 and L5-S1.
6. On July 13, 2005, plaintiff presented to Dr. Scott McCloskey of Catawba Valley Neurosurgical and Spine Services. Dr. McCloskey recommended continued non-operative treatment; however, he offered plaintiff the option of proceeding with an L4-S1 fusion. It was noted that a lumbar discogram would be a necessary diagnostic test prior to proceeding with surgery. Dr. McCloskey opined that a lumbar fusion is not a perfect solution and that "not all those people get better. As you well know in what you do, there are at least ten percent of them that are made a lot worse with the surgery. So, you know, pain clinic management is a reasonable option to consider."
. . . .
8. On March 23, 2006, plaintiff presented for a second opinion evaluation with Dr. [O. Del] Curling of Neurosurgical Evaluations of the Carolinas. Plaintiff was diagnosed with low back and leg pain of unclear etiology. Dr. Curling opined that plaintiff would be capable of modified work in a light-medium work capacity (35 lbs. maximal occasional lifting) with avoidance of repetitive bending or twisting or prolonged station, and with allowance for frequent changes in position as needed.
9. Plaintiff was terminated by defendant-employer for excessive absenteeism on 3 June 2005. The greater weight of the evidence shows that plaintiff's failure to report for work was due to the pain resulting from the work-related injury. The evidence also shows that plaintiff would at times provide a medical excuse to his employers after having already missed work, and that plaintiff updated defendant-employer of his condition but did not always call in on the date he was going to miss work.
10. Based upon the greater weight of the evidence, the Full Commission finds as fact that while plaintiff's reason for missing work was due to the pain resulting from his work-related injury, plaintiff failed to adhere to defendant-employer's policy regarding unexcused absences. Accordingly, plaintiff was terminated from employment for reasons unrelated to his injury and for reasons any non-injured employee would be terminated. Since defendants failed to assign error to any of the findings of fact excerpted above, "these findings are conclusively established on appeal" and are presumed to be supported by competent evidence. See Johnson v. Herbie's Place, 157 N.C. App. 168, 180, 579 S.E.2d 110, 118, disc. review denied, 357 N.C. 460, 585 S.E.2d 760 (2003). After receiving evidence, a deputy commissioner filed an Opinion and Award on 16 January 2007 addressing the following issue: "To what, if any, additional medical and/or indemnity benefits is plaintiff entitled?" The deputy commissioner determined that plaintiff has been "unable to obtain employment since the date of his termination on 3 June 2005" "due in large part to the ongoing physical restrictions resulting from the work-related injury." As a result, the deputy commissioner determined that defendants "remain[] responsible for benefit obligations arising out of plaintiff's job-related injury," which include current and future medical expenses, as well as temporary total disability compensation "continuing until plaintiff returns to work at his previous wages or until further Order of the Commission." Both defendants and plaintiff appealed to the Full Commission. On 2 November 2007, the Commission entered an Opinion and Award affirming the deputy commissioner's decision, with modifications. This appeal follows.
Our Supreme Court has "repeatedly held 'that our Workers' Compensation Act should be liberally construed to effectuate its purpose to provide compensation for injured employees or their dependents, and its benefits should not be denied by a technical, narrow, and strict construction.'" Adams v. AVX Corp., 349 N.C. 676, 680, 509 S.E.2d 411, 413 (1998) (quoting Hollman v. City of Raleigh, 273 N.C. 240, 252, 159 S.E.2d 874, 882 (1968)), reh'g denied, 350 N.C. 108, 532 S.E.2d 522 (1999). Under the Act, the Industrial Commission is "'the fact finding body,'" see id. (quoting Brewer v. Powers Trucking Co., 256 N.C. 175, 182, 123 S.E.2d 608, 613 (1962)), and "'the sole judge of the credibility of the witnesses and the weight to be given their testimony.'" Id. (quoting Anderson v. Lincoln Constr. Co., 265 N.C. 431, 433-34, 144 S.E.2d 272, 274 (1965)). When reviewing Industrial Commission decisions, "appellate courts must examine 'whether any competent evidence supports the Commission's findings of fact and whether [those] findings . . . support the Commission's conclusions of law.'" McRae v. Toastmaster, Inc., 358 N.C. 488, 496, 597 S.E.2d 695, 700 (2004) (emphasis added) (alteration and omission in original) (quoting Deese v. Champion Int'l Corp., 352 N.C. 109, 116, 530 S.E.2d 549, 553 (2000)). If the findings of fact are supported by competent evidence, those findings are conclusive on appeal "'even though there be evidence that would support findings to the contrary.'" See Adams, 349 N.C. at 681, 509 S.E.2d at 414 (quoting Jones v. Myrtle Desk Co., 264 N.C. 401, 402, 141 S.E.2d 632, 633 (1965)). "The Commission's conclusions of law are reviewed de novo." McRae, 358 N.C. at 496, 597 S.E.2d at 701. "The evidence tending to support plaintiff's claim is to be viewed in the light most favorable to plaintiff, and plaintiff is entitled to the benefit of every reasonable inference to be drawn from the evidence." Adams, 349 N.C. at 681, 509 S.E.2d at 414 (citing Doggett v. South Atl. Warehouse Co., 212 N.C. 599, 194 S.E. 111 (1937)).

I.
Defendants first contend the Commission erroneously determined that plaintiff was eligible for continuing temporary total disability compensation under the test established in Seagraves v. Austin Co. of Greensboro, 123 N.C. App. 228, 472 S.E.2d 397 (1996), and adopted byMcRae v. Toastmaster, Inc., 358 N.C. 488, 597 S.E.2d 695 (2004). Defendants argue that plaintiff failed to satisfy his burden under Seagraves and, thus, should not be entitled to continued disability benefits. We disagree.
In Seagraves, this Court held that when an employee who has "sustained a compensable injury" and has been "provided light duty or rehabilitative employment[] is terminated from such employment for misconduct or other fault on the part of the employee, such termination does not automatically constitute a constructive refusal to accept employment so as to bar the employee from receiving benefits for temporary . . . total disability." Seagraves, 123 N.C. App. at 233-34, 472 S.E.2d at 401. Rather, this requires a further examination of whether
the employee's loss of, or diminution in, wages is attributable to the wrongful act resulting in loss of employment, in which case benefits will be barred, or whether such loss or diminution in earning capacity is due to the employee's work-related disability, in which case the employee will be entitled to benefits for such disability.
Id. at 234, 472 S.E.2d at 401.
Accordingly, to bar payment of benefits, "an employer must demonstrate initially that: (1) the employee was terminated for misconduct; (2) the same misconduct would have resulted in the termination of a nondisabled employee; and (3) the termination was unrelated to the employee's compensable injury." McRae, 358 N.C. at 493, 597 S.E.2d at 699; see also id. at 493-94, 597 S.E.2d at 699 ("An employer's successful demonstration of such evidence is deemed to constitute a constructive refusal by the employee to perform suitable work, a circumstance that would bar benefits for lost earnings . . . .") (internal quotation marks omitted). However, an employee may still be "entitled to benefits if he or she can demonstrate that work-related injuries, and not the circumstances of the employee's termination, prevented the employee from either performing alternative duties or finding comparable employment opportunities." See McRae, 358 N.C. at 494, 597 S.E.2d at 699 ("[A] showing of employee misconduct is not dispositive on the issue of benefits if the employee can demonstrate that his or her subsequent failure to perform suitable work or find comparable work was the direct result of the employee's work-related injuries.") (emphasis added). Nevertheless, "if the terminated-for-misconduct employee fails to show by the greater weight of the evidence that his or her inability to find or perform comparable employment is due to the employee's work-related injuries, the employer is then freed of further benefit responsibilities." Id. at 495, 597 S.E.2d at 700.
Here, defendants did not assign error to the portion of the Commission's Conclusion of Law 4 which determined that defendant-employer satisfied its burden under Seagraves. Instead, defendants assign error to the following excerpted findings of fact and conclusion of law which support the Commission's determination that plaintiff satisfied his burden under Seagraves:
11. Following his termination, plaintiff sought employment at multiple businesses, but was unsuccessful due in large part to the ongoing physical restrictions resulting from the work-related injury. . . .
12. . . . As a result of the work-related injury, plaintiff has been unable to obtain employment since the date of his termination on June 3, 2005.
. . . .
4. . . . [P]laintiff's current unemployment status is due in large part to the symptoms resulting from his job-related injury, and not to the misconduct which resulted in his termination. Accordingly, plaintiff is eligible for temporary total disability compensation from June 3, 2005 and continuing until plaintiff returns to work at his previous wages or until further Order of the Commission. [McRae v. Toastmaster, Inc., 358 N.C. 488, 597 S.E.2d 695 (2004).]
As we stated above, "[t]he findings of fact of the Industrial Commission are conclusive on appeal when supported by competent evidence, even though there be evidence that would support findings to the contrary." Deese, 352 N.C. at 115, 530 S.E.2d at 552-53 (alteration in original) (internal quotation marks omitted). Keeping in mind that "[t]he evidence tending to support plaintiff's claim is to be viewed in the light most favorable to plaintiff, and plaintiff is entitled to the benefit of every reasonable inference to be drawn from the evidence," id. at 115, 530 S.E.2d at 553 (internal quotation marks omitted), we now examine the relevant evidence in this case. Here, following his termination, plaintiff received Employment Security benefits for approximately 26 weeks. In order to receive those unemployment benefits, plaintiff testified that he was required to "have actively searched for work [at] two or more places a week" while receiving the benefits. In support of his testimony, plaintiff provided a seven-page, handwritten "Work Search History," entered as Plaintiff's Exhibit 1, which chronicled, by week, the name of the business or organization from which he sought employment, the date and time he visited or spoke with the business or organization, and the name of the contact person, "if any," with whom he recalled speaking about any employment opportunities. Plaintiff testified that he would either "[j]ust go[] to different companies or some contact by phone," seeking types of employment that he described as "limitedI mean as far as theeither anything that's likeit can't be any kind of lifting really like stuff that I've done in the past. It's like secretarial or desk work." Plaintiff testified that he was limited to the amount of pounds he could lift and that his movement was restricted to exclude "climbing or bending or stooping." On cross-examination, in response to a question about whether each listing on his Work Search History represented a job for which he applied, plaintiff testified, "Somea lot ofif they're not applied for, I went in or called to see if they were hiring. They're not all just, you know, jobs that have been applied forno." Plaintiff also provided the following testimony:
Q. So some of these places, if I understand correctly, were not hiring.
A. Correct
Q. Which?
A. or were not hiring for my limitations.
Q. Which of these positions were actually hiringwhich of these places?
A. None.
Q. None of them were hiring?
A. Corrector if I gave an applicationif I filled out an application for certain ones, I never heard back from any.
. . . .
Q. The [defendants' attorney] also asked you about whether the folks took applications on this partial list here you provided or whether they were hiring. At one time, you said they weren't hiring people of my limitations, and another time, you said they weren't hiring, so what is your testimony regarding whether the employerspotential employers indicated on this (unintelligible) considered you for employment?
[C]OURT. Let me ask you this: Do you think they were not hiring anybody or they were not hiring you? In other words, were there jobs available and you just didn't get them, or were these places you just called and they didn't have any jobs available for anybody.
[A.] A lot of them, they didn't have jobs available. And then there were
[C]OURT. For anybody?
[A.] Correct.
[C]OURT. Okay.
[A.] And then there were a lot thatI don't feel like that they wereI feel like because of my limitations that that
[C]OURT. All right.
Q. And then
[A.] had a negative, you know, effect on me.
. . . .
Q. . . . [G]oing back to your job search and the places that you have listed here on your work search history, you testified that a lot of these places simply were not hiring?
A. Correct.
Q. And that some of them, you felt, did not hire you because of your limitations?
A. Correct.
Q. What exactly were you conveying to these places when you applied as to your limitations?
A. WellI mean even some management positions, you know, they still require you to do, you know, lifting, and you don't just sit at a desk, of course, so you haveyou know, you have to be forthcoming about what your limitations are as far as what you can do on the floor as well as, you know, behind closed doors or
Q. And when you were forthcoming, what were you conveying to them?
A. As far as lifting and such as that.
Q. Exactly. But exactly what did you indicate to the employers that your specific limitations included?
A. Whateverlike from Dr. McCloskey[, the board-certified neurosurgeon and authorized treating physician for plaintiff]his limitations of the lifting of fifteen to twenty pounds, and then no bending or climbing.
Q. And which of these employers advised you that they did not have a position for you because of your restrictions?
A. I'mthere are so many, I can'tI can't recall.
Q. You don't recall any of them?
A. Thelike I said, there has [sic] been so many timesyou know, so many people that I've spoken with, I really can't. I don't have an answer for that.
Defendants assert that, although plaintiff "felt" some employers were not hiring him because of his limitations, there is no competent evidence that potential employers "in fact" did not hire plaintiff because he was physically unable to perform specific job duties. Nevertheless, this Court has previously stated that when a "plaintiff expressly testified that his efforts to obtain subsequent employment were thwarted by his medical restrictions resulting from the accident and no one would consider him because of those restrictions," no further competent evidence is required to support the Industrial Commission's findings of fact and conclusions of law based on that testimony. See Joyner v. Mabrey Smith Motor Co., 161 N.C. App. 125, 130-31, 587 S.E.2d 451, 455 (2003); cf. Byrd v. Ecofibers, Inc., 182 N.C. App. 728, 731, 645 S.E.2d 80, 82 ("This Court has previously held that an employee's own testimony as to pain and ability to work is competent evidence as to the employee's ability to work."), disc. review denied, 361 N.C. 567, 650 S.E.2d 599 (2007). In our consideration of defendants' assertion, we recognize that "this Court may set aside a finding of fact only if it lacks evidentiary support," see Rose v. City of Rocky Mount, 180 N.C. App. 392, 400, 637 S.E.2d 251, 256 (2006) (emphasis added) (internal quotation marks omitted), disc. review denied, 361 N.C. 356, 644 S.E.2d 232 (2007), and that our "duty goes no further than to determine whether the record contains any evidence tending to support the [challenged] finding[s of fact]." See Deese, 352 N.C. at 115, 530 S.E.2d at 552 (internal quotation marks omitted). Here, the Commission determined that plaintiff's unrefuted testimony and seven-page work search history were both credible and sufficient to support its findings that plaintiff was unsuccessful finding employment following his termination "due in large part to the ongoing physical restrictions resulting from [his] work-related injury." Accordingly, when viewed in the light most favorable to plaintiff's claims, see Adams, 349 N.C. at 681, 509 S.E.2d at 414, we must affirm the Commission's Findings of Fact 11 and 12, as well as its Conclusion of Law 4, which concluded that plaintiff satisfied his burden under Seagraves and so is entitled to continued temporary total disability compensation.

II.
Defendants next contend the Commission's finding that "[b]oth Dr. McCloskey and Dr. Hunt opined that plaintiff's pre-existing renal cyst condition was not contributing to his current symptoms and that plaintiff's back condition was the result of the work-related injury" is not supported by competent evidence. We disagree.
While our Supreme Court has "allowed 'could' or 'might' expert testimony as probative and competent evidence to prove causation," Young v. Hickory Bus. Furniture, 353 N.C. 227, 233, 538 S.E.2d 912, 916 (2000), "[e]xpert testimony that a work-related injury 'could' or 'might' have caused further injury is insufficient to prove causation when other evidence shows the testimony to be 'a guess or mere speculation.'" Cannon v. Goodyear Tire & Rubber Co., 171 N.C. App. 254, 264, 614 S.E.2d 440, 446-47 (quotingYoung, 353 N.C. at 233, 538 S.E.2d at 916), disc. review denied, 360 N.C. 61, 621 S.E.2d 177 (2005). "However, when expert testimony establishes that a work-related injury 'likely' caused further injury, competent evidence exists to support a finding of causation." Id. at 264, 614 S.E.2d at 447 (citing Alexander v. Wal-Mart Stores, Inc., 166 N.C. App. 563, 573, 603 S.E.2d 552, 558 (2004) (Hudson, J., dissenting), rev'd per curiam, 359 N.C. 403, 610 S.E.2d 374 (2005) (reversing for the reasons stated in the dissenting opinion)).
In the present case, the Commission considered testimony from plaintiff in which he described the pain he experienced after suffering from his work-related injury, as well as the pain he experienced as a result of his polycystic kidney disease.
Q. And when you were in the store, at what part of your body did you feel these sensations?
A. Lower back, hip and down mydown both legs and to like the calf areas.
Q. Had youhad you experienced similar sensations prior to this event at the Lowe's store on January 27th, 2005?
A. No.
. . . .
Q. . . . [Y]ou have a history of polycystic kidney disease, is that correct?
A. Correct.
Q. And how long have you been treating [sic] for that condition?
A. I've never been treated for it. I've been diagnosed for [sic] it for quite some time, but thereI've never been treated for it. There is really no treatment for it.
Q. And you have had occasions where those cysts have ruptured?
A. Correct.
Q. And typically that manifests itself in pain in the lumbar region and kidney region, is that correct?
A. In themore so in just the kidney region.
Q. When is the last time you were treated for such a rupture?
A. I really can't remember. I've never really been treated for the rupture of the cyst, if that's what you're asking.
. . . .
Q. The [defendants' attorney] asked you if you experienced pain when you would have these cysts on your kidneys rupture, and I believe you indicated yes. What, if any, difference is there between the low back pain you began experiencing on January 27th, 2005 and the times that you've experienced the cyst rupture? Describe the difference, if any.
A. There is definitely a difference. I mean I knowI mean I've had the kidney disease forI've known about that for quite some time. I know if I haveif there is a cyst that ruptures, yes, I have pain, but it's not like intense, severe pain, but it'sand then I have a lot of nausea from thefrom the cyst rupture because all that
. . . .
A. fluid is dispersed throughout the body.
The Commission also considered deposition testimony from two of plaintiff's treating physiciansDr. Scott McCloskey, a board-certified neurosurgeon, and Dr. Christopher Hunt, an anesthesiologist also specializing in pain management. Viewed in the light most favorable to plaintiff, Dr. Hunt provided the following testimony:
Q. Were you informed about any history as to the etiology of [plaintiff's] back pain?
A. That's correct. [Plaintiff] had indicated that he injured his back January of 2005 when he was moving a wallpaper rack and in the process of moving, apparently he wrenched his back and developed pain into his right hip and some pain down in his lower extremities as well.
Q. You also note in the past medical history one entry, polycystic disease. What is polycystic disease in reference to your treatment of [plaintiff]?
A. Well polycystic isit's unrelated to any of his pain conditions. It's a [sic] inherited disease where you develop cysts on the kidney and it would not be anything related to the pain condition that he's complaining of.
Q. Why do you say that? That is a possible issue in this case and you've sort of come right to it here at the very beginning of your deposition. Why is it your opinion that the pre-existing polycystic disease is not the source of the pain for which you've treated him?
A. Well, he's had polycystic disease presumably for many, many years and I don't know that you could explain his symptoms based upon cysts on his kidneys. At least in the focus of my evaluation, I don't think that that's possible.
. . . .
Q. We've had a trial in this matter. [Plaintiff] has testified under oath and he testified that the event at work when he was moving these displays, he immediately felt a sharp onset of pain that caused him to have to stop doing what he was doing and it has continued on since then. Assuming that thethat testimony's found to be truthful, do you have an opinion as to what the most likely reason this pain has had its onset.
. . . .
A. Well, my opinion would be that if [plaintiff] states the pain started at the time of the injury then that would beif that's found to be truthful, then I would have to agree with that.
. . . .
A. . . . Furthermore, pain on theyou know, generated from [renal cysts] would be something that would be ongoing pain and that you would think it would have been preceding the incident that the patientthat the[plaintiff] has eluded [sic] to. So my opinion is based upon the fact that he started having pain after the incident and based upon the MRIs that I've reviewed.
. . . .
A. . . . Typically, pain as a result of kidney pain or from renalkidney stones is flank pain, which is higher up than what [plaintiff] was complaining of, certainly wouldn't be consistent with the lower back pain that he was complaining of when he came to see me. Furthermore, he's having pain down into his groin area, down into the thighs and it would be hard to come up with a way that a kidney stone or a cyst on the kidneys could potentially cause those types of symptoms.
Finally, Dr. McCloskey further testified:
Q. Now, assuming that the Industrial Commission finds that [plaintiff's] testimony [about the cause of his injury at work and about the pain he is experiencing as a result of that injury] is credible and that he's experienced no other trauma since the date of his injury that he's testified to, do you have an opinion as to the most likely cause for his current back pain?
. . . .
A. Yes, sir.
Q. What is your opinion, Doctor?
A. My opinion is that based on his history and events of the injury that occurred at work, as you just related, is the cause of his discogenic back pain.
. . . .
A. I think that the patient's history is compatible with it being an injury to the back that occurred as mentioned by [plaintiff's attorney], that that history seems incompatible of it being due to a kidney problem that he's had his whole life. So by his history and the way his symptoms present itself [sic], it would seem unlikely that the polycystic disease of the kidney is the cause of these set of symptoms.
Viewed in the light most favorable to plaintiff, we hold there was competent evidence to support the Commission's Finding of Fact 7 that plaintiff's "pre-existing renal cyst condition was not contributing to his current symptoms and that plaintiff's back condition was the result of the work-related injury." Accordingly, we overrule this assignment of error.

III.
Finally, defendants contend the Commission erred by failing to adopt the "non operative pain management" recommendations of Dr. O. Del Curling, Jr., who conducted an independent medical evaluation of plaintiff, and suggest that this Court "should find that a discogram is not medically necessary until [plaintiff] has utilized adequate conservative measures." We decline to make such a finding.
As we stated above, in its review of an Opinion and Award from the Industrial Commission, this "[C]ourt's duty goes no further than to determine whether the record contains any evidence tending to support the finding[s of fact]," and an award "shall be conclusive and binding as to all questions of fact." See Deese, 352 N.C. at 115, 530 S.E.2d at 552 (internal quotation marks omitted). "[T]he full Commission is the sole judge of the weight and credibility of the evidence, and . . . appellate courts reviewing Commission decisions are limited to reviewing whether any competent evidence supports the Commission's findings of fact and whether the findings of fact support the Commission's conclusions of law." Id. at 116, 530 S.E.2d at 553. It is not the role of this Court to make alternative findings to those of the Commission, as defendants suggest in their brief and, accordingly, we conclude that this argument is not properly before us.
Therefore, we affirm the Commission's Opinion and Award.
Affirmed.
Judges McGEE and STEPHENS concur.
Report per Rule 30(e).
NOTES
[1] In the North Carolina Industrial Commission's Opinion and Award, defendant-employer's name is referenced as "Custom Rental Services." However, since documents submitted to this Court by the parties suggest that defendant-employer's name should read "Custom Retail Services," we note this correction.